HAGENS BERMAN SOBOL SHAPIRO LLP
STEVE W. BERMAN
THOMAS E. LOESER (BAR NO. 202724)
1918 Eighth Avenue, Suite 330
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
toml@hbsslaw.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP
JOHN B. QUINN (Bar No. 090378)
SHON MORGAN (Bar No. 187736)
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443 3000
Facsimile: (213) 443 3100
shonmorgan@quinnemanuel.com

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| JESS HILL, KEVIN JENTES, MALIA SIAS, ARTHUR SCHAREIN, MICHAEL BOZINE, CLIFFORD BROUSSARD, VICTORIA MCCLELLAND, JEREMIAH HOLDEN, HILDEGARD REISER, M.D., SPENCER MOORE, JOHN GAUGER, HANAA RIFAEY, DEBORAH MARKWARD, JOHN BROWN, CHRISTINA PAOLICCHI, ADAM FRUGOLI, TRACEY ROSEN, JEFFREY BRADY, BOUALIVANH PHANHPHONGSANE, BRENDA PENNEY, MICHAEL ANTIS, ALEX ARCENEAUX, G. KEATING PEPPER, DEVAN WANG, ROBERT HOOKER, MATTHEW OLOVSON, WILLIAM MACKEY, EDWARD SIMMONS, | No. 2:15-cv-07604-DOC-SP |
| | **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| | **[Fed. R. Civ. P. 65]** |
| | Hearing Date: Nov. 9, 2015<br>Hearing Time: 8:30 a.m.<br>Courtroom: 9D<br>Judge: Hon. David O. Carter |
| | **<u>JURY TRIAL DEMANDED</u>** |

1   CHARLES HALL, KOTAB HOLDINGS
2   LLC, ALAN BRANTING, CHAD
    RAMOS, STEVEN BOLDUC, JOSEPH
3   AVENA, ANDREW MASTERS,
    STEVEN KOLPAN, PAUL PURYEAR,
4   MICHELLE GRAMLING, DAVID
5   PYLE, HEATHER GREENFIELD,
    KYLE BOYLAN, RALPH
6   MENDENHALL, ALEXANDER
7   BAITTINGER, ANDREW BELL, GARY
    VAN GUILDER, BARRY CROSS,
8   JUSTIN HOLLOWAY, KELLY KING,
9   KAREN NORMAN, ANDREW
    VENTURA, TROY PONTO, SCOTT
10  TAYLOR, CARLOS ORTIZ, and BRIAN
11  MILLS, on behalf of themselves and all
12  others similarly situated,

13                          Plaintiffs,

14      v.

15
16  VOLKSWAGEN GROUP OF
    AMERICA, INC., a New Jersey
17  Corporation, and VOLKSWAGEN AG, a
18  corporation organized under the laws of
    Germany,
19
20                          Defendants.

21
22
23
24
25
26
27
28

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION ................................................................................................ 1

RELIEF REQUESTED ............................................................................................... 1

PRELIMINARY STATEMENT ................................................................................ 2

STATEMENT OF FACTS ......................................................................................... 4

LEGAL STANDARD ............................................................................................... 11

I.    PLAINTIFFS ARE VIRTUALLY CERTAIN TO SUCCEED ON THE MERITS ........................................................................................................ 12

    A.    The Nationwide Class Is Very Likely To Succeed On Its Fraud Claim ................................................................................................... 12

    B.    The Class Is Very Likely To Succeed On Its Individual State Law Claims .................................................................................................. 14

II.   PLAINTIFFS HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF ................................................................................. 14

    A.    Class Members Suffer Irreparable Harm By Becoming Forced Polluters ............................................................................................... 15

    B.    Ceasing Use of the Offending Cars Causes Irreparable Harm ............... 16

III.  THE BALANCE OF EQUITIES TIPS DECISIVELY IN PLAINTIFFS' FAVOR ........................................................................................................ 17

    A.    The Balance of Equities Favors Plaintiffs ............................................ 17

    B.    Financial Consequences Do Not Tilt The Equities in VW's Favor ....... 18

IV.   THE PUBLIC INTEREST STRONGLY SUPPORTS THE GRANT OF A PRELIMINARY INJUNCTION ................................................................. 20

V.    THE COURT SHOULD GRANT PROVISIONAL CLASS CERTIFICATION ..................................................................................... 21

    A.    The Rule 23(a) Factors are Met ............................................................ 22

    B.    The Rule 23(b)(2) factors are met ......................................................... 23

VI.   THE COURT MAY APPOINT A SPECIAL MASTER TO DEVELOP AND ADMINISTER THE BUY BACK PROGRAM ................................... 24

VII.  CONCLUSION .......................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advanced Res'l, Inc. v. Tri-Star Petroleum Co.,*
 4 F.3d 327 (4th Cir. 1993) .................................................................. 13

*Alliance for the Wild Rockies v. Cottrell,*
 632 F.3d 1127 (9th Cir. 2011) ........................................................... 12

*American Trucking Assocs., Inc. v. City of Los Angeles,*
 559 F. 3d 1046 (9th Cir. 2009) .......................................................... 16

*Amoco Production Co. v. Village of Gambell, Alaska,*
 480 U.S. 531, 107 S. Ct. 1396, 94 L.Ed.2d 542 (1987) ...................... 20

*Arizona Dream Act Coal. v. Brewer,*
 757 F.3d 1053 (9th Cir. 2014) ..................................................... 16, 17

*California Native Plant Soc'y v. U.S. E.P.A.,*
 No. C06-3604 (MJJ), 2007 WL 2021796 (N.D. Cal. July 10, 2007)..... 19

*Chalk v. U.S. Dist. Court Cent. Dist. of California,*
 840 F. 2d 701 (9th Cir. 1988) ............................................................ 15

*Cleveland Hair Clinic, Inc. v. Puig,*
 968 F. Supp. 1227 (N.D. Ill. 1996)..................................................... 19

*Cordoza v. Pac. States Steel Corp.,*
 320 F.3d 989 (9th Cir. 2003) ............................................................. 24

*Direx Israel, Ltd. v. Breakthrough Med. Corp.,*
 952 F.2d 802 (4th Cir. 1991) ............................................................. 20

*F.T.C. v. Pharmtech Research, Inc.,*
 576 F. Supp. 294 (D.D.C. 1983)......................................................... 20

*Fox Television Stations, Inc. v. FilmOn X LLC,*
 966 F. Supp. 2d 30 (D.D.C. 2013)...................................................... 19

*Hanlon v. Chrysler Corp.,*
 150 F.3d 1011 (9th Cir. 1998) ........................................................... 22

- ii -

*Independent Living Center of Southern California, Inc. v. Maxwell-Jolly*,
    572 F.3d 644 (9th Cir. 2009) ............................................................... 11

*Keegan v. Am. Honda Motor Co., Inc.*,
    284 F.R.D. 504 (C.D. Cal. 2012) ........................................................ 23

*Lands Council v. McNair*,
    537 F.3d 981 (9th Cir. 2008) ............................................................... 20

*League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*,
    752 F.3d 755 (9th Cir. 2014) ......................................................... 17, 20

*Lee v. Orr*,
    Case No. 13-cv-8719, 2013 WL 6490577 (Dec. 10, 2013, N.D. Ill.) .................... 21

*Madrid v. Gomez*,
    889 F. Supp. 1146 (N.D. Cal. 1995) .................................................. 25

*Meyer v. Portfolio Recovery Associates, LLC*,
    707 F.3d 1036 (9th Cir. 2012) ............................................... 12, 21, 22

*National Rural Electric Coop. v. Nat'l Agric. Chem. Assoc.*,
    Civ. A. No. 91-1568 (HHG), 1992 WL 477020 (Nov. 25, 1992, D.D.C.) ............ 15

*Nguyen v. Trojan Capital Investments, LLC*,
    No. SACV 14-1983-DOC, 2015 WL 268919 (Jan. 16, 2015, C.D. Cal.) ............ 12

*Norsworthy v. Bear*,
    87 F. Supp. 3d 1164, 1193 (N.D. Cal. 2015) ..................................... 15

*In re Northrop Grumman Corp. ERISA Litig.*,
    No. CV 06-06213 MMM, 2011 WL 3505264 (C.D. Cal. Mar. 29, 2011) ............ 23

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Co. Consumer Pharm. Co.*,
    290 F.3d 578 (3d Cir. 2002) ............................................................... 19

*Parkinson v. Hyundai Motor America*,
    258 F.R.D. 580 (C.D. Cal. 2008) ........................................................ 22

- iii -

*Parsons v. Ryan*,
    754 F.3d 657 (9th Cir. 2014) ................................................................ 24

*Pimentel v. Dreyfus*,
    670 F. 3d 1096 (9th Cir. 2012) ............................................................. 12

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,
    944 F. 2d 597 (9th Cir. 1991) .............................................................. 16

*Rex Medical L.P. v. Angiotech Pharm. (US), Inc.*,
    754 F. Supp. 2d 616 (S.D.N.Y. 2010) ................................................... 19

*Rodriquez v. Hayes*,
    591 F.3d 1105 (9th Cir. 2010) ............................................................. 24

*Sierra Forest Legacy v. Rey*,
    577 F.3d 1015 (9th Cir. 2009) ............................................................. 18

*Stewart v. Ragland*,
    934 F.2d 1033 (9th Cir. 1991) ............................................................. 13

*Wal-mart Stores, Inc. v. Duke*,
    131 S.Ct. 2541 (2011)........................................................................ 24

*Walters v. Reno*,
    145 F. 3d 1032 (9th Cir. 1998) ............................................................ 24

**Other Authorities**

Fed. R. Civ. P. 23 ........................................................................ 21, 22, 23 24

010549-11  820908 V1

**NOTICE OF MOTION**

NOTICE IS HEREBY GIVEN that on November 9, 2015, at 8:30 a.m., or as soon thereafter as counsel may be heard, before the Honorable David O. Carter, in Courtroom 9D, located at the Ronald Reagan Federal Building and United States Courthouse, 411 West Fourth Street, Santa Ana, California 92701, Plaintiffs will and hereby do move this Court, pursuant to Federal Rule of Civil Procedure 65, for an order: (a) enjoining Defendants to offer to buy back from class members their defective vehicles at their fair market price as of September 2, 2015, the day before Defendants admitted to their seven year scheme to defraud the Environmental Protection Agency, the State of California, and the American car buying public; (b) for provisional class certification; and (c) for appointment of a Special Master to oversee the buy back program, all as set forth in more detail below.  This motion is based upon this notice of motion and the following memorandum of points and authorities, on accompanying declarations of multiple class members, the Request for Judicial Notice, the proposed order lodged herewith, and upon such other matters as may be presented to the Court at or before the time of the hearing.

**RELIEF REQUESTED**

By this motion, Plaintiffs respectfully request that the Court enter an order: (a) enjoining Defendants Volkswagen Group of America, Inc. and Volkswagen AG to offer to buy back from class members their defective vehicles at their fair market price as of September 2, 2015, the day before Defendants admitted to their seven year scheme to defraud the Environmental Protection Agency, the State of California, and the American car buying public; (b) for provisional class certification of the class and sub-classes; and (c) for the appointment of a Special Master to oversee the buy back program, as well as granting Plaintiffs all other relief to which they are entitled.

- 1 -

**PRELIMINARY STATEMENT**

In what Joan Claybrook, former Administer of the National Highway Safety Administration, has termed "the greatest vehicle emission fraud in history," Defendants Volkswagen Group of America and Volkswagen AG (collectively, "VW" and respectively, "VoA" and "VWAG") have admitted defrauding the Environmental Protection Agency, the State of California and hundreds of thousands of American consumers in a seven-year scheme to evade automobile emissions regulations. VW's fraud caused environmentally concerned American consumers to become unwitting polluters, expelling oxides of nitrogen into our air at up to 40 times the legal limit. Only days ago, VW told Congress it will be *years* before a retrofit program can be implemented. The class needs relief now. Plaintiffs seek a preliminary injunction ordering VW to offer to buy back the defective cars at the fair market price of the cars *before* VW admitted their fraud.

The vast majority of the half-million U.S. Volkswagen and Audi buyers purchased their cars precisely because of VW's widely advertised promise of "clean diesel." Those same buyers have now been forced to become very public polluters. Yet on October 8, 2015, Michael Horn, the Chief Executive Officer of VoA, testified to Congress that VW will *not* buy back the defective cars, it will "fix them." But Horn also testified that VW will not even *start* to retrofit the half-million polluting vehicles in the United States until *next* year and that the program will take *years* to complete. Because no retrofit has yet been designed or approved, there is no way to predict when, if ever, the affected automobiles will be modified to conform to their advertised "clean diesel" and performance features. It is doubtful some of the older models can be retrofitted at all.

VW's stance is that Americans should just go on polluting the air at illegal and unhealthy levels while it tries to figure out a solution. But members of the class should not have to drive these cars during that indefinite period and neither they, nor

- 2 -

the American public should be exposed to these unacceptable levels of pollution.  Nor should they have to stand for VW's foot-dragging.  Class members should not be forced to choose between two unsatisfactory alternatives:  driving their defective vehicles and thereby causing exactly the environmental harm they sought to avoid when they purchased their cars at premium prices over gasoline engine counterparts, or (for those who can afford it) buying a replacement.  This Court should grant preliminary injunctive relief, ordering Defendants to offer to buy back all class members automobiles at the Kelley Blue Book price *before* Defendants' September 3, 2015 admission of their wrongdoing (the market value of the cars having since crashed[1]).  Pursuant to Fed. R. Civ. P. 53, the Court should also appoint a Special Master to design and oversee the buy back offer program.

This motion demonstrates the following:

- *Class members will continue to suffer irreparable harm until this Court grants Plaintiffs' motion for preliminary injunctive relief.*  The only practical way class members can obtain the benefit of their bargain is a prompt buy-back offer at pre-scandal price levels.  Otherwise, their choices are: continue to drive illegal, highly polluting cars; or attempt to sell them at fire-sales prices; or, for those class members who can afford to pay for two cars, to park their Volkswagens or Audis indefinitely and purchase a new car.  None of these options provides any practical relief to the class.

- *Defendants' damning public admissions virtually ensure Plaintiffs' success on the merits.*  Although Defendants' senior officers implausibly contend the fraud was the handiwork of a "couple" or "three" engineers, they have admitted the scheme.  They admitted marketing cars as "clean diesel" that "reduce[d] nitrogen oxide emissions by up to 90 percent" when in fact they emit up to 40 times the legal levels of oxides of nitrogen.  Complaint, ¶ 15. With these facts admitted, Plaintiffs are virtually certain to prevail on their claims.

---

[1] Christina Rogers, *Kelley Blue Book: Volkswagen Diesel Car Values Decline 13%*, The Wall Street Journal (Oct. 6, 2015), http://www.wsj.com/articles/kelley-blue-book-volkswagen-diesel-car-values-decline-13-1444147701.

- 3 -

- *Because the same fraudulent claims were made to the world, the class is highly likely to be certified.* Based on this showing, this Court can grant preliminary injunctive relief on a class-wide basis under settled law.

- *The equities overwhelmingly favor Plaintiffs.* Virtually all class members purchased their cars precisely because of VW's claims of "clean diesel." In almost all cases, the same model was available with gasoline engine models at *lower* prices. Class members were tricked into becoming the biggest polluters on the road instead of driving environmentally friendly cars. The fraud was deliberate, calculated and long-lasting. The equities weigh on Plaintiffs' side.

- *Granting a preliminary injunction strongly favors the public interest.* Absent injunctive relief, most class members will have no option but to continue to drive cars that pollute far in excess of extant legal maximums. The public interest clearly favors getting these cars off the road. Now. VW will continue to degrade the environment through their fraud and, according to one widely-circulated report, literally *kill* people. "The software that the company admitted using to get around government emissions limits allowed VWs to spew enough pollution to cause somewhere between 16 and 94 deaths over seven years, with the annual count increasing more recently as more of the diesels were on the road. The total cost has been well over $100 million. That's just in the United States."[2]

Plaintiffs respectfully request the Court grant their motion for preliminary injunctive relief in all respects.

### STATEMENT OF FACTS

***"Our company was dishonest."*** Those were the words spoken by Michael Horn, President and CEO of Volkswagen Group of America three weeks ago, in reference to the discovery that VW had installed "defeat devices" on the same vehicles it had touted as "clean and green." Compl., ¶ 44. In full, he stated: "So let's be clear about this: our company was dishonest with the EPA and the California Air Resources

---

[2] Seth Borenstein, *AP Analysis: Dozens of Deaths Likely from VW Pollution Dodge*, The Big Story (Oct. 3, 2015), http://bigstory.ap.org/article/a6925f0af82e44aaa1a1ed4b55d030f6/ap-analysis-dozens-deaths-likely-vw-pollution-dodge.

- 4 -

Board, and with all of you.  And in my German words, we've totally screwed up.  We must fix those cars . . ."  *Id.*

Mr. Horn's *mea culpa* came only long after the EPA, following up on an investigation by the CAFEE,[3] conducted an investigation and ultimately confirmed that VW was employing "cheating software" to keep regulators from discovering that vehicles containing its 2.0L (so-called) "Clean Diesel" engine were emitting noxious pollutants into the environment at far above the allowable limit.[4]

VW executives appear contrite and forthright now that the company has been caught.  But in 2014 when California regulators and the EPA first suspected the fraud, VW stonewalled and kept stonewalling for well over a year until they had no choice:[5] "They were very aggressive."[6]  They claimed the emissions findings were the result of "technicalities" that the "researchers and regulators did not understand."[7]  They told the regulators that "we didn't know what we were doing."[8]  All the while, unknowing consumers continued to buy these defective cars.

The "cheating software" referred to during the Congressional investigation has no purpose other than to hide from regulators the true polluting nature of the vehicle.

---

[3] Center for Alternative Fuels, Engines & Emissions of West Virginia University.

[4] *See Volkswagen's Emissions Cheating Allegations: Initial Questions: Hearing Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce*, 114th Cong. (2015) (statement of Rep. Tim Murphy, Chairman, Subcomm. on Oversight & Investigations of the H. Comm. on Energy & Commerce). *See also* Danny Hakim, et al., *As Volkswagen Pushed to Be No. 1, Ambitions Fueled a Scandal*, N.Y. Times (Sep. 26, 2015), http://www.nytimes.com/2015/09/27/business /as-vw-pushed-to-be-no-1-ambitions-fueled-a-scandal.html.

[5] Notice of Violation from The U.S. Environmental Protection Agency to Volkswagen AG, Audi AG and Volkswagen Group of America, Inc. (Sep. 1, 2015), http://www3.epa.gov/otaq/cert/documents/vw-nov-caa-09-18-15.pdf.

[6] Hakim, *supra* note 5.

[7] *Id.*

[8] *Id.*

The defeat device detects when the vehicle is undergoing official emissions testing and turns full emissions controls on during the test.  At all other times, the emissions controls are suppressed.  As a result, during normal operations, the vehicles emit oxides of nitrogen at up to 40 times the standard allowed under federal and state laws and regulations.  The term "defeat device" comes from the 1970 Clean Air Act, which makes the use of such devices illegal.  Compl., ¶ 2.  The EPA has issued a Notice of Violation based on the existence of the defeat devices in these cars.[9]

**_VW's "unbridled ambition" to become the world's largest automaker led to this fraud_**.  VW's decision to disable emissions controls was at the heart of its grand plan to become the world's largest automaker, and, in particular, to dominate the market in the United States.[10]  VW management put "enormous strain" on its managers to deliver growth in this country.[11]  The company did not want to try to compete in the hybrid-electric market against such vehicles as the already popular and heralded Toyota Prius.  It chose instead to pursue its goal with diesel, a formidable task given diesel fuel's inherent smog factor, a problem which ran "head-on into American air pollution standards."[12]  VW solved this problem not with innovation, but by using their reputation for creative engineering to hide a simpler solution: cheating.[13]

**_The plan worked:  consumers bought in droves._**  VW supported its plan to become the best-selling auto manufacture in America by boasting – falsely – about both its performance prowess and environmental cleanliness.  Compl., ¶ 15.  It promoted its vehicles as among the most fuel efficient and environmentally friendly in

---

[9] Notice of Violation, *supra* note 5.

[10] Hakim, *supra* note 4.

[11] *Id.*

[12] *Id.*

[13] *Id.*

010549-11 820908 V1

the U.S. market.  *Id.*  And it did so by specifically touting the very feature that made the vehicles dirty.  For example:

- Its 2008 press release touted its exhaust treatment system which purportedly "reduces nitrogen oxide emissions (NOx) by up to 90 percent."  *Id.*

- Its 2008 fuel economy guide talked about its "fantastic power train" that "gives very good fuel economy" and "is also good for the environment . . . ."  Compl., ¶ 16.

- It advertised the vehicles as "clean enough to be certified in all 50 states."  *Id.*

- It launched a campaign entitled "Burn rubber, not money," promoting its "lean, mean, cleaner-burning machine."  Compl., ¶ 18.

- It caused the press to report that its diesel engines "put[] out 25% less greenhouse gas emissions than what a gasoline engine would."  Compl., ¶ 20.

In every form of promotion automakers employ – print, broadcast, and online advertisements, and sales brochures and press releases, among others – VW proclaimed its diesel engines achieved cleanliness and fuel efficiency while not sacrificing power:  "With the 2.0L Volkswagen TDI engine, you'll appreciate every fuel-efficient mile with the EPA-estimated 45 hwy mpg.  But that's only half the story. Step on the pedal and feel the 236 lb-ft of torque and let the performance tell the other half."  Compl., ¶ 22.  VW was correct that it was only half the story, but unfortunately for consumers, the other half was left untold.

**_Consumer pride turns to humiliation_**.  For decades, consumers who have been buying VWs were not just buying cars; for many, the purchase also made a statement about contributing to a cleaner environment.  As the class member declarations show, they were proud of their choice.  This is true, and perhaps even especially true, for those who purchased the vehicles with the "Clean Diesel" engine in 2009-2015,

including the Jetta, Beetle, Passat, and Audi A3, and the Golf in 2012-2015.  Owning and driving these cars was a source of pride.

Now, class members report their pride has turned to humiliation, knowing they are driving vehicles – and are *seen* driving vehicles – that are spewing greenhouse gas emissions far in excess of what is legal or responsible.  This is not the choice they made.  As one prototypical VW driver states:

> The 2010 Jetta Sportswagen TDI was the first car my husband and I bought together, and we did so not long before we got married. We wanted a "green car" because we wanted the car taking us both on our errands and our adventures to impact the environment as little as possible (while still being fun to drive). I was proud of and loved our VW, and over the last five years have recommended it to multiple friends. I've worked on progressive causes, including climate change, for more than a decade, and felt like this car was a symbol of many of the causes I worked for professionally. I had no plan of driving anything but this car until it died, which we figured would be in a very long time.
>
> Learning that I was unintentionally contributing to global warming for more than five years was a horrifying shock. Volkswagen's deception feels like a close and personal betrayal. I am incredibly angry. We have a toddler, and I am pregnant with our second child. My husband has had asthma since he was a child. I feel sick every time I drive our car, wondering how I'm harming their health - as well as the health of everyone else we drive by (such as the 20-some children on our street alone). I'm embarrassed that I have no choice but to drive this car now.

Ex. A, Rifaey Decl., ¶¶ 3-4.

Other defrauded consumers echo Ms. Rifaey's sentiments:

- I feel embarrassed to drive my car . . .[14]

- It's embarrassing to be driving this vehicle now with all the news about the deception and pollution. I have always prided myself on my

---

[14] Ex. B, Greenfield Decl., ¶ 6.

- 8 -

environmental actions and decisions, and had I known the truth I would have steered well clear of this car.[15]

• . . . I feel very guilty every time I get in my car.  I bought this car to . . . try to lighten my environmental footprint.[16]

• . . . the social stigma associated with being a "forced polluter" in a state like Colorado is palpable.[17]

• Ever since the news of VW's fraud broke, I do not want to drive my car.  I feel shamed by my co-workers, by my neighbors, and for good reason.[18]

***Consumers are left with unsalable vehicles and no prospect of relief anytime soon.***  Consumers paid thousands of extra dollars to own a vehicle with a "Clean Diesel" engine.  In 2015, for example, the premiums ranged from $1,000 for a mid-level Golf, to $6,855 for a top line Passat.  Compl., ¶ 50.  And whereas VW promised these vehicles would have "a higher resale value versus comparable gasoline vehicles," they are now unsalable.  Compl., ¶¶ 23, 52.  VW has halted all sales of affected vehicles, new or used, virtually guaranteeing that dealers will not accept these tainted vehicles as trade-ins.  Compl., ¶ 52.

Nor has VW offered a solution.  Nearly a month after this scandal erupted, there is no relief in sight.  Volkswagen has stated that unidentified fixes are in development.[19]  Volkswagen representatives have told lawmakers and the media that

---

[15] Ex. C, Bell Decl., ¶ 5.

[16] Ex. D, Masters Decl., ¶ 4.

[17] Ex. E, Holden Decl., ¶ 4.

[18] Ex. F, Puryear Decl., ¶ 4.

[19] The Associated Press, *VW May Compensate Owners of Diesel Cars for Loss of Value*, N.Y. Times (Oct. 9, 2015), http://www.nytimes.com/aponline/2015/10/08/us/ap-us-volkswagen-consumers.html. *See also* Angelo Young, *Volkswagen Diesel Scandal: Most Recalled Cars Will Require Work To Exhaust Systems, Not Just Software*, International Business Times (Oct. 8, 2015). http://www.ibtimes.com/volkswagen-diesel-scandal-most-recalled-

any remedy will take significant time.  Mr. Horn told the congressional committee on October 8 that fixing the affected vehicles "will take years and require approval from regulators."[20]  While a small number of vehicles will get by with a software fix, according to Mr. Horn, most affected cars will "require more extensive changes including possible installation of urea tanks that neutralize harmful emissions and particulates,"[21] which will not even get started until next year at the earliest and could take up to two years to complete.[22]  Because this is a worldwide problem, with 480,000 affected vehicles in the U.S. alone,[23] two years seems optimistic.

Volkswagen has rejected suggestions that it provide loaner vehicles and has announced no plans to buy back the vehicles.[24]  Thus, consumers presently have no option that any reasonable person would consider satisfactory.  Drivers of affected cars are presented with a Hobson's choice:  sideline their cars (which most people cannot possibly do) or emit up to 40 times the legal limits for oxides of nitrogen.

---

cars-will-require-work-exhaust-systems-not-2132764 ("The necessary hardware fix . . . has yet to be worked out at the company's Wolfsburg, Germany, headquarters . . . .").

[20] Reuters, *House Slams Regulators for Not Catching VW for Years*, N.Y. Times (Oct. 9, 2015), http://www.nytimes.com/reuters/2015/10/09/business/09reuters-volkswagen-emissions.html.  *See also VW's U.S. chief tells Congress: no timetable to fix diesel cars*, The Dallas Morning News (Oct. 9, 2015), http://www.dallasnews.com/business/headlines/20151008-vws-u.s.-chief-tells-congress-no-timetable-to-fix-diesel-cars.ece ("Hundreds of thousands of owners of Volkswagen diesel cars that skirt emissions standards may have to wait a year or more to get their cars fixed, the head of the automaker's U.S. unit said at a contentious House hearing Thursday.").

[21] Reuters, *House Slams Regulators*, *supra* note 21.

[22] Danielle Ivory and Keith Bradsher, *Regulators Investigating 2nd VW Computer Program on Emissions*, N.Y. Times (Oct. 8, 2015), http://www.nytimes.com/2015/10/09/business/international/vw-diesel-emissions-scandal-congressional-hearing.html.

[23] *Id.*

[24] Young, *supra* note 20; Ivory and Bradsher, *supra* note 23.

- 10 -

Consumers are justifiably unhappy about the untenable position they have been forced into by VW:

- Quite frankly, I don't feel comfortable driving it around right now considering all of the items that have recently come to light. The problem is I can't afford to be without a vehicle while VW delays their solution…[25]

- I cannot afford to simply let it sit and buy another. I'm between a rock and hard place because I won't get the resale value and I'm stuck driving this polluting vehicle.[26]

- There is nothing I can do except let my car sit in the garage, pollute the earth, or sell it. If I sell my car . . . I will definitely lose thousands of _extra_ dollars . . . If it sits in the garage, then I have no mode of transportation.[27]

- Volkswagen is now saying that it may be a year or longer before my car is fixed so that it's not polluting at unconscionable levels, which is unacceptable. However, I have no choice but to continue to drive my TDI – it's not as if I have a spare backup car that I can use instead.[28]

- After learning of the emission issues with VW diesels in September 2015, I feel sick and stuck.[29]

## LEGAL STANDARD

The determination to issue a preliminary injunction is within the discretion of the district court guided by the well-established requirements. _Independent Living Center of Southern California, Inc. v. Maxwell-Jolly_, 572 F.3d 644, 651 (9th Cir. 2009). The moving party must show: (1) a likelihood of success on the merits; (2) a possibility of irreparable harm to the moving party in the absence of preliminary relief;

---

[25] Ex. G, Ramos Decl., ¶ 4.

[26] Ex. H, Norman Decl., ¶ 5.

[27] Ex. I, Van Guilder Decl., ¶ 5.

[28] Ex. J, Simmons Decl., ¶ 11.

[29] Ex. K, Scharein Decl., ¶ 30.

- 11 -

1   (3) that the balance of equities tips in favor of the moving party; and (4) that an

2   injunction furthers the public interest.  *Pimentel v. Dreyfus,* 670 F. 3d 1096, 1105 (9th

3   Cir. 2012) (citing *Winter v. Natural Res. Def. Council, Inc.*, 55 U.S. 7, 20, 129 S. Ct.

4   365, 172 L.Ed.2d 249 (2008)).  The Ninth Circuit applies a "sliding scale" test, under

5   "which the elements of the preliminary injunction test are balanced, so that a stronger

6   showing of one element may offset a weaker showing of another." *Alliance for the*

7   *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).[30]  Plaintiffs seek relief

8   on a classwide basis, and hence must also establish the Court should grant provisional

9   class certification.  *See Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036,

10  1041-43 (9th Cir. 2012) (affirming preliminary injunction and grant of provisional

11  class certification).  All required elements are satisfied here.[31]

## I.   PLAINTIFFS ARE VIRTUALLY CERTAIN TO SUCCEED ON THE MERITS

13      Plaintiffs assert both nationwide claims and individual state law claims.  In light

14  of the fact that VW has publicly admitted its fraudulent scheme, the elements of these

15  claims are met.

## A.   The Nationwide Class Is Very Likely To Succeed On Its Fraud Claim

17      The nationwide class asserts a claim for fraud.  (Complaint, ¶¶ 155-69.)  The

18  elements of Plaintiffs' fraud claim are: (1) a misrepresentation by the defendant, (2)

19  with knowledge of its falsity, (3) made with the intent to induce reliance, (4) which

---

[30] As this Court recently explained in *Nguyen v. Trojan Capital Investments, LLC*, No. SACV 14-1983-DOC, 2015 WL 268919, at *2 (Jan. 16, 2015, C.D. Cal.) "[a]lternatively, the Court may grant temporary relief on a lesser showing of probable success.  'If the harm that may occur to the plaintiff is sufficiently serious, it is only necessary that there be a fair chance of success on the merits. 'The burden may be met by demonstrating either 'a combination of probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in its favor.'" (citations omitted).

[31] Injunctive relief is widely available under the applicable consumer protection statutes.  *See* Appendix submitted herewith.

- 12 -

1   actually induces reliance, and (5) resulting damages.  *See Stewart v. Ragland*, 934

2   F.2d 1033, 1043 (9th Cir. 1991) (applying California law); *see also Advanced Res'l,*

3   *Inc. v. Tri-Star Petroleum Co.*, 4 F.3d 327, 335 (4th Cir. 1993) (applying Virginia

4   law).

5            VW's representations about its "clean" technology and fuel efficiency, made to

6   induce consumers concerned about the environment and their pocketbooks to purchase

7   VWs instead of competing vehicles, are textbook examples of fraud.  Its promise of a

8   "lean, mean and cleaner-burning machine," made using different language at different

9   times (*see, e.g.,* Compl., ¶ 18) and in widespread distribution were meant to – and did

10  – lure consumers to VW dealers, both VW loyalists who had long-standing trust in the

11  brand, and new customers looking for the best automotive technology to meet their

12  needs.  *See* Compendium of consumer declarations, filed herewith.  All believed they

13  were paying a premium for new environmentally friendly technology, and had no way

14  of knowing that the technology they were paying for was the "cheating software"

15  which VW now admits it intentionally installed in its vehicles.

16           There is no doubt that these facts will be proven.  VW already has stood before

17  the U. S. Congress and admitted them:

18       Mr. Horn:      We have broken the trust of our customers, dealerships, employees,
                        as well as the public and the regulators. And let me be very clear.
19                      We at Volkswagen take full responsibility for our actions....

20           …

21

22       Q:             On September 3, 2015, VW admitted to CARB and EPA that it had
                        installed defeat devices in certain model year 2009 and model 2015
23                      vehicles. **To the best of your knowledge, did VW install this**
                        **software for the express purpose of defeating emissions**
24                      **controls?**

25       A:             **To our understanding … it was installed for this purpose, yes.**[32]
26

27  _____

28           [32] *See Volkswagen's Emissions Cheating Allegations: Initial Questions: Hearing
     Before the Subcomm. on Oversight & Investigations of the H. Comm. on Energy &*

These admissions, that VW installed the defeat devices, that it did so for the purpose of cheating on the emissions testing, and that it betrayed the trust of its customers, combined with the declarations of customers that they relied on VW's representations of clean burning engines and fuel efficiency and have been financially and personally harmed as a result, are sufficient to establish fraud.

**B.      The Class Is Very Likely To Succeed On Its Individual State Law Claims**

Plaintiffs also have sued under the consumer protection statutes of each state that has such a statute permitting such actions.  Although those laws differ in respects that sometimes can bear on a claim, the core liability theories and facts here do not implicate any of these differences.  Thus, no extended state-by-state analysis is required.  All these statutes make actionable conduct that amounts to fraudulent and false advertising to consumers.  Thus, the same facts that will render VW liable on the nationwide fraud claim make liability a virtual certainty on the state consumer protection claims.

**II.      PLAINTIFFS HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT PRELIMINARY INJUNCTIVE RELIEF**

There is a strong likelihood that absent preliminary injunctive relief, plaintiffs and the class will continue to suffer the irreparable harm they have suffered very publicly since VW admitted the scandal on September 18, 2015.  Currently, consumers have no viable way to exit the horrible situation VW has placed them in and refuses to timely remedy.  As one plaintiff expressed it, VW's affected customers are "stuck."  Ex. K, Scharein Decl., ¶ 6.

Because VW has admitted no fix is imminent (if a fix exists at all), the pollute-or-don't drive dilemma class members face leaves them no acceptable option, merely a choice of irreparable harms.

_____

*Commerce*, 114th Cong. (2015) (statement of Michael Horn, president and CEO of Volkswagen Group of America).

- 14 -

**A.     Class Members Suffer Irreparable Harm By Becoming Forced Polluters**

It is self-evident that no consumer should be conscripted into being a polluter or law breaker.  That fate is particularly repugnant to this group of consumers, who by the very purchase of these vehicles demonstrated a heightened environmental consciousness.  They all stepped up and, for the greater good, paid a substantial premium for a car that would reduce their individual emissions footprint.  As a result of VW's fraud, these public-spirited citizens are now in the untenable position of being forced to pollute with every mile driven.  By failing to offer an immediate remedy, VW is reprehensibly requiring its customers to *exacerbate* pollution at exorbitant levels.

Courts have held that the stigma of being an environmental polluter is irreparable harm.  In *National Rural Electric Coop. v. Nat'l Agric. Chem. Assoc.*, Civ. A. No. 91-1568 (HHG), 1992 WL 477020, at *5 (Nov. 25, 1992, D.D.C.), the court granted a preliminary injunction because the defendant's infringement of the plaintiff's trademark would have harmed the plaintiff's reputation by casting "a stigma of environmental pollution" on it.[33]  The same is true here, where, as class members report in their declarations, they are being shamed and stigmatized.  Courts have found irreparable harm in analogous situations, such as harm to reputation, loss of goodwill, and emotional distress and related psychological states.  *See Chalk v. U.S. Dist. Court Cent. Dist. of California,* 840 F. 2d 701, 709 (9th Cir. 1988)(emotional and psychological harms from job reassignment); *Norsworthy v. Bear,* 87 F. Supp. 3d 1164, 1193 (N.D. Cal. 2015) (emotional distress, anxiety, depression, and other

---

[33] The court was clear that the stigma the plaintiff would have suffered was sufficient to justify the preliminary injunction even if the defendant had rebutted the rebuttal presumption that violation of a trademark is irreparable harm.  *Id.* ("Even absent the presumption of irreparable harm, [the plaintiff] would be harmed by confusion with the [defendant] because of the [defendant]'s association with agricultural chemical companies.  Whether deserved or not, there is a stigma of environmental pollution associated with agricultural chemical companies.").

psychological problems); *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F. 2d 597, 603 (9th Cir. 1991) (damage to reputation); *American Trucking Assocs., Inc. v. City of Los Angeles,* 559 F. 3d 1046, 1057 (9th Cir. 2009) (loss of goodwill).

VW's fraudulent scheme was so brazen it is doubtless the best known automotive cheat in history, and the scandal is thus known by a very high percentage of the public.  Likewise, few things people do are more public than driving.  The result of those two facts is that every time a class member drives one of VW's "CleanDiesel" cars, he or she will very publicly be seen as a polluter.  The class member declarations before this Court amply show the painful embarrassment and anxiety that class members suffer from their public acts of forced pollution.

**B.      Ceasing Use of the Offending Cars Causes Irreparable Harm**

Although class members almost uniformly would prefer to never again fire up these tainted engines, for most consumers abstaining from car use is not an option.  Again, commons sense supports this proposition.  With the exception of a home for those who can afford to buy one, a car purchase or lease is generally the largest expenditure in any household.  Unlike a mislabeled package of cereal or a defective blender, VW customers cannot simply stop using the offending product and await later monetary compensation.  Cars are a daily necessity for most Americans.

Not surprisingly, courts have recognized in other contexts that being deprived of the ability to drive a car constitutes irreparable harm.  In *Arizona Dream Act Coal. v. Brewer,* 757 F.3d 1053, 1068 (9th Cir. 2014), the plaintiffs were undocumented immigrants in Arizona who sought driver's licenses, but were unable to obtain them due to a policy implemented by the state of Arizona government.  Although the district court found plaintiffs were likely to succeed on their claim, it denied plaintiffs' request for a preliminary injunction based on the absence of irreparable harm.  *Id.* at 1060. The Ninth Circuit reversed, holding that "Plaintiffs' inability to obtain driver's

- 16 -

licenses likely causes them irreparable harm by limiting their professional opportunities." *Id.* at 1068. Their "ability to drive is integral to their ability to work – after all, eighty-seven percent of Arizona workers commute to work by car." *Id.* The court concluded that "[n]o award of damages can compensate Plaintiffs[] for the myriad personal and professional harms caused by the inability to obtain driver's licenses." *Id.*

The reasoning of *Arizona Dream Act* applies here. VW's "clean diesel" cars cannot be EPA certified, cannot legally be sold with defeat devices, and pollute the environment at illegal levels. Although the EPA at this point has not imposed a legal bar to driving the cars, those class members who understandably choose not to drive them given the environmental impact and public exposure are still deprived of their primary means of transportation. For some class members – delivery persons, Uber or Lyft drivers, for instance – their car is not only their way to get to work, it *is* their work. As in *Arizona Dream,* "[n]o award of damages can compensate Plaintiffs[] for the myriad personal and professional harms" resulting from VW's fraud.

The *Arizona Dream Court* referred to the harm before it as an "intangible harm[]," stating "[b]ecause intangible injuries generally lack an adequate legal remedy, 'intangible injuries [may] qualify as irreparable harm.'" *Id.* (citing *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)) (bracketed word added by *Arizona Dream Court*). The class members are suffering precisely such intangible harm at present and will continue to suffer it until a buy back program is executed.

## III.   THE BALANCE OF EQUITIES TIPS DECISIVELY IN PLAINTIFFS' FAVOR

### A.   The Balance of Equities Favors Plaintiffs

Balancing the equities in a motion for preliminary injunction requires a comparison between the plaintiff's irreparable harm and the economic interests of the defendant. *League of Wilderness Defenders/Blue Mountains Biodiversity Project v.*

- 17 -

*Connaughton*, 752 F.3d 755, 765 (9th Cir. 2014); *see also Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009).  The equities here are on plaintiffs' side.  If the preliminary injunction is granted, class members will have the ability to take their defective, illegal, polluting cars off the road and choose an environmentally friendly car that actually is what its manufacturer says it is.  Stated otherwise, granting the preliminary injunction will alleviate the class members' irreparable harm and the wrongful effects (widespread pollution) that were inherent consequence of VW's fraudulent scheme.  *See* Compendium of consumer declarations, filed herewith.

**B.     Financial Consequences Do Not Tilt the Equities in VW's Favor**

VW can be expected to object to the cost of a buy back program.  In light of VW's assertions that they can "fix" these cars, the true cost to VW of an immediate buy-back remedy for consumers is not their buy back payment to the class.  Rather, it is their buy back payment to the class **minus** the value of the cars after remediation.  If VW is to be believed, they can restore the cars to their pre-admission value, thereby minimizing the financial impact of an injunction.  The question is who should bear the cost burden while VW is designing and installing new technology:  innocent consumers who VW cheated, or VW – the party that caused the problem and had 90 billion euro in assets as of its last annual report.[34]  Placing that burden on VW not only is just, it creates a powerful incentive for the company to solve the problem as quickly as possible while serving the public interest by getting the polluting cars off the road.

In any event, cost is not a reason to deny an injunction where, as here, other factors weigh strongly in favor of an injunction.  Likelihood of success and irreparable harm are overwhelmingly demonstrated in this case.  Complaining about the cost of an injunction also should be viewed with skepticism, given VW's profits from this fraud.

---

[34] Volkswagen Aktiengesellschaft, "moving progress:  Annual Report 2014" (March 12, 2015) at 94, *available at* http://www.volkswagenag.com/content/vwcorp/info_center/en/publications/2015/03/Y_2014_e.bin.html/binarystorageitem/file/GB+2014_e.pdf.

Over the period of VW's scheme – and in material part because of that scheme – VW became the world's largest automotive manufacturer.  Its fraud has generated many billions of dollars of profits over the last seven years. The cost of the injunction is merely commensurate with the scope of the fraud.

Negative financial consequences often result from the entry of preliminary injunctions.  Short of certain insolvency, appeal to the financial consequences as a basis to deny an injunction is routinely rejected.  A party's asserted financial injury will not defeat a request for a preliminary injunction where the necessary elements are satisfied, and especially where, as here, Plaintiffs' countervailing consequences are immediate, ongoing, and significant.  *See, e.g.*, *Fox Television Stations, Inc. v. FilmOn X LLC*, 966 F. Supp. 2d 30 (D.D.C. 2013) (finding the balance of equities weighed in favor of the plaintiffs' requested preliminary injunction prohibiting a streaming service provider from retransmitting programming, even though the provider's business could be crippled by the injunction); *Rex Medical L.P. v. Angiotech Pharm. (US), Inc.*, 754 F. Supp. 2d 616, 625-26 (S.D.N.Y. 2010) (finding the equities favored granting preliminary injunction preventing the termination of a distribution agreement between a medical-device company and a distributor despite claim by distributor that its financial condition would worsened by being forced to carry unprofitable product); *California Native Plant Soc'y v. U.S. E.P.A.*, No. C06-3604 (MJJ), 2007 WL 2021796, at *23-24 (N.D. Cal. July 10, 2007) (granting preliminary injunction and noting that equities favored the plaintiffs despite the defendants' assertions of the "crippling financial harms" they would suffer an injunction issued).[35]

---

[35] *See also Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Co. Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (finding the balance of harms favored preliminary injunction in manufacturer's false-advertising action against a competitor; any loss to the competitor of its investment and goodwill in the product name was self-imposed); *Cleveland Hair Clinic, Inc. v. Puig*, 968 F. Supp. 1227, 1248-49 (N.D. Ill. 1996) (holding the harm to the operator of a hair transplant clinic if preliminary injunctive relief was wrongfully denied outweighed any harm that doctors,

1    Even if VW argues the financial cost of complying with an injunction weights

2    the balance of the equities towards it that would not change the overall calculus.

3    Under the Ninth Circuit's sliding scale approach to preliminary injunctive relief, the

4    overwhelming likelihood of success here more than balances any equities favoring

5    defendant. *Cf. Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 808 (4th

6    Cir. 1991) ("[I]f the plight of the defendant is not substantially different from that of

7    the plaintiffs, that is, if there is no imbalance of hardship in favor of the plaintiff, then

8    the probability of success begins to assume real significance, and interim relief is more

9    likely to require a clear showing of a likelihood of success) (internal quotation marks

10   omitted).

11   **IV.    THE PUBLIC INTEREST STRONGLY SUPPORTS THE GRANT
           OF A PRELIMINARY INJUNCTION**

12

13       Beyond the personal effects on class members of driving cars known to be

14   illegal and becoming forced polluters, the consequent environmental injury itself is a

15   recognized irreparable harm.  "Environmental injury, by its nature, can seldom be

16   adequately remedied by money damages and is often permanent or at least of long

17   duration, *i.e.*, irreparable." *Amoco Production Co. v. Village of Gambell, Alaska*, 480

18   U.S. 531, 545, 107 S. Ct. 1396, 94 L.Ed.2d 542 (1987); *Lands Council v. McNair*, 537

19   F.3d 981, 1004 (9th Cir. 2008) (en banc, quoting *Amoco*); *League of Wilderness*

20   *Defenders*, 752 F.3d at 764 (same).  In *League of Wilderness Defenders*, the Ninth

21   Circuit reversed the district court's order denying a preliminary injunction and

22   instructed the district court on remand to enter such an injunction in order to avoid

23   continuing environmental harm.  *Id.* at 762-768.  The public interest embodied in

24   who provided services to the clinic, would suffer if relief was wrongfully granted);

25   *F.T.C. v. Pharmtech Research, Inc.*, 576 F. Supp. 294, 303 (D.D.C. 1983) (granting

26   preliminary injunction against defendant's advertisements and stating that

27   "[a]dmittedly, the issuance of a preliminary injunction may have certain adverse

28   financial consequences [on defendant] . . .  [t]hese costs, while not insubstantial, do

     not in any respect outweigh the public equities to be considered").

- 20 -

federal and state emission standards can only be served by creating a method to get these cars off the road now.

## V.    THE COURT SHOULD GRANT PROVISIONAL CLASS CERTIFICATION

Courts have ruled that their general equitable power allows the entry of a preliminary injunction benefitting all class members prior to the entry of a class certification order.

> "District courts have the power to order injunctive relief covering potential class members prior to class certification." *Ill. League of Advocates for the Developmentally Disabled v. Ill. Dep't of Human Servs*, No. 13 C 1300, 2013 U.S. Dist. LEXIS 90977 (N.D. Ill. June 28, 2013).  "The court may conditionally certify the class or otherwise order a broad preliminary injunction, without a formal class ruling, under its general equitable powers.  The lack of formal class certification does not create an obstacle to classwide preliminary injunctive relief when activities of the defendant are directly generally against a class of persons." *Id.*(citing 3 *Newberg on Class Actions* § 9:45 (4th ed. 2002) and *N.Y. State Nat. Org. for Women v. Terry*, 697 F. Supp. 1324, 1336 (S.D.N.Y. 1988).

*Lee v. Orr*, Case No. 13-cv-8719, 2013 WL 6490577, at *2 (Dec. 10, 2013, N.D. Ill.).

The Ninth Circuit, however, requires some form of "provisional class certification" for the district court to grant classwide relief.  *See Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1040 & 1043 (9th Cir. 2012) (affirming grant of provisional class certification and rejecting the defendant's argument that Federal Rules of Civil Procedure did not authorize provisional class certification).  The court in *Meyer* held a provisional class certification order was appropriate where the plaintiff satisfied the requirements of Rule 23(a): numerosity, commonality, typicality and adequacy.  *Id.* at 1041-1042.  Those requirements are met here.

- 21 -

**A.      The Rule 23(a) Factors are Met**

**Numerosity.**  Rule 23(a)(1) requires that the class be so numerous that joinder of all members is "impracticable." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998) (quoting FED. R. CIV. P. 23(a)(1)).  Here, VW sold 483,000 of the defective "Clean Diesel" cars to American consumers.

**Commonality and Typicality.**  In *Meyer*, the Ninth Circuit explained:

> The commonality and typicality requirements of FRCP 23(a) "tend to merge," but they "both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claims and the class claims are so interrelated that the interest of the class members will be fairly and adequately protected in their absence." [Citing *Wal-mart Stores, Inc. v. Duke*, 131 S.Ct. 2541, 2551 n.5 (2011).]  "All questions of fact and law need not be common to satisfy the [commonality requirement.]  The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998).

707 F.3d at 1041.

Here, there was one fraudulent scheme.  The facts are common to the class.  The controlling law is common to the national class, and common in relevant respects to this motion as to the state subclasses.  As *Meyer* noted, commonality requirements often "merge" into typicality requirements, as they do here.  The class representative's claims are typical of the claims of the class.  *See Parkinson v. Hyundai Motor America*, 258 F.R.D. 580, 595-96 (C.D. Cal. 2008) (finding commonality where "plaintiffs' central common question is whether the 2003 manual-transmission Tiburon suffered from a flywheel defect"). The questions raised by the claims have a sufficient common factual and legal basis, and their determination will resolve the central issues of this case in one stroke.

- 22 -

**Adequacy.**  The adequacy-of-representation requirement of Rule 23(a)(4) involves a two-part inquiry: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Keegan v. Am. Honda Motor Co., Inc.*, 284 F.R.D. 504, 525 (C.D. Cal. 2012) (quoting *Hanlon*, 150 F.3d at 1020).  Adequacy depends on an "absence of antagonism" and a "sharing of interest" between class representatives and absentee class members.  *Id*. (quoting *Ellis v. Costco Wholesale Grp.*, 657 F.3d 970, 985 (9th Cir. 2011)).  The class representatives' interests are aligned with those of the class, and there are no conflicts or antagonism – they have suffered economic loss from the same misrepresentations disseminated by Defendants.  Plaintiffs understand and are prepared to fulfill their duties to the class.  Likewise, it is not anticipated Defendant's will raise any challenge to the adequacy of Plaintiffs' counsel.  Both Hagens Berman and Quinn Emanuel possess the necessary qualifications, experience, and resources to vigorously prosecute this action.[36]

## B.    The Rule 23(b)(2) Factors Are Met

In addition to satisfying all Rule 23(a) prerequisites, a class seeking injunctive relief must further satisfy Rule 23(b)(2).  Rule 23(b)(2) provides that: "A class action may be maintained if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or

---

[36] Although Rule 23 does not expressly require that a proposed class be ascertainable, courts imply such a condition.  *Id*. (citing *Xavier v. Phillip Morris USA, Inc.*, 787 F. Supp. 2d 1075, 1089 (N.D. Cal. 2011)).  Ascertainability is satisfied when it is "administratively feasible for the court to determine whether a particular individual is a member."  *In re Northrop Grumman Corp. ERISA Litig.*, No. CV 06-06213 MMM (JCx), 2011 WL 3505264, at *7 n.61 (C.D. Cal. Mar. 29, 2011).  The Class definition here utilizes objective criteria that make membership objectively verifiable.  The purchase or lease of a VW or Audi vehicle specified by model and model year is easily demonstrated, and class members will be readily identified via the R.L. Polk Registration data or other ownership documents.

- 23 -

corresponding declaratory relief is appropriate respecting the class as a whole . . . ." Fed. R. Civ. P. 23(b)(2).  The Supreme Court has interpreted this to mean that classwide injunctive relief must provide benefit to all class members (even if in different ways).  *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557–58 (2011)); *see also Parsons v. Ryan*, 754 F.3d 657, 686-88 (9th Cir. 2014) (holding the same).

Importantly, the requirements for certifying a class under (b)(2) seeking only injunctive relief are less stringent than those for a (b)(3) class seeking monetary relief. *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2558 (holding for (b)(2) class, no need to determine whether common issues predominate or whether class action is superior); *Walters v. Reno,* 145 F. 3d 1032, 1047 (9th Cir. 1998) (same); *Rodriquez v. Hayes,* 591 F.3d 1105, 1125 (9th Cir. 2010) ("[R]ule 23(b)(2)] does not require us to examine the viability of bases of class members' claims for declaratory and injunctive relief, but only to look at whether class members seek uniform relief from a practice applicable to all of them.").

Here, VW has "refused to act" on grounds that apply to the entire class by refusing to offer a remedy that would allow consumers to stop driving these heavily polluting vehicles.  The interim injunctive relief plaintiffs seek would benefit all class members by offering them a viable immediate remedy.  These circumstances thus satisfy the requirements of Rule 23(b)(2).

## VI.   THE COURT MAY APPOINT A SPECIAL MASTER TO DEVELOP AND ADMINISTER THE BUY BACK PROGRAM

Federal Rule of Civil Procedure 53 allows a district court to appoint a special master to assist it.  Such appointments are especially appropriate in cases that present unusual demands on the court:  "[I]n this era of complex litigation, special masters may, subject to judicial review, be called upon to perform a broad range of judicial functions."  *Cordoza v. Pac. States Steel Corp.*, 320 F.3d 989, 995 (9th Cir. 2003).  The judicial functions a special master may perform include not only the relatively common task of supervising discovery, but also "[d]eveloping a

- 24 -

comprehensive remedy." *Madrid v. Gomez*, 889 F. Supp. 1146, 1282 (N.D. Cal. 1995) (observing "assistance of a Special Master is clearly appropriate" in developing comprehensive remedy in complex cases).

In this case, a Special Master could help design, implement, and administer the buy back offer program.  He or she could establish the necessary procedures to get the program up and running, impose time limits to meet the goals of the program,  resolve disputes about eligibility, fine-tune pricing should the need arise, and otherwise free the Court from daily involvement in the administration of the preliminary injunction remedy sought.

## VII.   CONCLUSION

This case presents an extraordinary and profoundly disturbing set of facts. VW's arrogance and disregard for their customers, the global environment, and the public health is evident not only from their fraudulent scheme – targeted in particular at capturing the American market – but also in their response to being caught:  force the admittedly deceived car buyers to be the ones to continue to bear the burden of VW's fraud while VW tries to figure out how to "fix" it, which VW projects will not be for a year or two, and in reality, may materialize far later than that, or never.

The only sure way to restore class members to the pre-scandal status quo, alleviate their irreparable harm, protect the environment, and ensure that VW will move rapidly and deliberately to remedy the disaster it unleashed in pursuit of profit, is to impose the injunction Plaintiffs respectfully request.

DATED:  October 12, 2015          HAGENS BERMAN SOBOL SHAPIRO LLP

By  */s/ Thomas E. Loeser*
      Thomas E. Loeser (Bar No. 202724)
      Steve W. Berman
   1918 Eighth Avenue, Suite 3300
   Seattle, Washington 98101
   Telephone: (206) 623-7292
   Facsimile: (206) 623-0594
   steve@hbsslaw.com
   toml@hbsslaw.com

- 25 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

John B. Quinn (Bar No. 090378)
Shon Morgan (Bar No. 187736)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone: (213) 443-3000
Facsimile: (213) 443-3100
johnquinn@quinnemanuel.com
shonmorgan@quinnemanuel.com

Lee Gordon (Bar No. 174168)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 203
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
lee@hbsslaw.com

Peter B. Fredman (Bar No. 189097)
LAW OFFICE OF PETER FREDMAN
125 University Avenue, Suite 102
Berkeley, California 94710
Telephone: (510) 868-2626
Facsimile: (510) 868-2627
peter@peterfredmanlaw.com

*Attorneys for Plaintiff and the Proposed Class
and Subclasses*

010549-11 820908 V1